[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14427

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 03, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-00046-CR-01-RLV-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TURHAN JAMAR LAMONS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 3, 2008)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

The defendant in this case was a flight attendant, Turhan Jamar Lamons, who the Government alleged was responsible for two incidents intended to disrupt the normal operations of two commercial flights. The first incident involved a threatening telephone call made on September 18, 2001, just before the scheduled departure of AirTran Airways Flight 278 from Atlanta to Boston. The second incident involved a fire set to the lavatory of Comair Flight 5491 on May 8, 2003, en route from Atlanta to Huntsville, Alabama. In two separate jury trials, Lamons was found guilty of four counts: (1) willfully and maliciously conveying false information consisting of a false bomb threat, (2) interfering with crew members by setting fire to an aircraft, (3) willfully setting fire to a civil aircraft operated in interstate commerce, and (4) knowingly and unlawfully using fire to commit a felony prosecutable in federal court.

The district court sentenced Lamons to a total term of 271 months' imprisonment. Lamons now appeals his convictions, contending that the district court abused its discretion by admitting certain billing records in his first trial and by permitting evidence of his conviction in the first trial to be admitted during his second trial. Lamons also appeals his sentences, arguing that the district court improperly found that Lamons had intentionally endangered the safety of an

2

aircraft by setting fire to it, and that the district court's findings of fact infringed his constitutional rights under the Fifth and Sixth Amendments. We affirm the district court's judgment in all respects.

I.

A.

The Threatening Telephone Call

On September 18, 2001, Turhan Jamar Lamons was working as a flight attendant for AirTran Airways ("AirTran") and was assigned to Flight 278, which was scheduled to depart Atlanta International Airport at about 8:30 a.m. for Boston. According to other members of the crew of Flight 278, Lamons did not want to leave Atlanta that day. Flight attendant Ashfaq Nensey testified that on September 17, Lamons confided in him that Lamons was too frightened to go to Boston. Nensey responded that Lamons could probably be removed from the flight "because the [post-September 11] situation [was] so delicate," but Lamons replied that he would not be pay-protected and that he needed the money. The next morning, Lamons told Nensey that he had just been notified that his grandmother had passed away. Nensey informed Lamons that, with a death in the family, Lamons could request removal from Flight 278 without a reduction in

3

pay.[1]

When Nensey boarded Flight 278, he was surprised to see Lamons standing in the back of the aircraft. Lamons was talking on his cell phone while the passengers were boarding, which was against AirTran policy. Nensey began to walk toward Lamons several times to remind him of the company policy; each time that he saw Nensey approach, however, Lamons would hang up his cell phone. This sequence happened several times. Nensey last noticed Lamons using his cell phone about one or two minutes prior to departure.

On the morning of September 18, 2001, AirTran gate agent Nicole Miller was manning Gate C-10 at the Atlanta airport. While she stood at the top of the jetway eating a breakfast sandwich, the telephone at Gate C-10 began to ring. By the time Miller was able to answer it, however, the telephone had stopped ringing. Miller then returned to the jetway. Miller estimated that this occurred between five and ten times. Finally, she succeeded in answering the telephone at some time between 8:15 a.m. and 8:20 a.m. A male voice informed her that everyone on Flight 278 was going to die. Miller replied, "Excuse me?" The caller repeated the

---

[1] On the way to the airport on the morning of September 18, Lamons also told the captain of Flight 278, Franz Federschmidt, that his uncle had just died. Captain Federschmidt expressed condolences and suggested that Lamons could be taken off the flight. Lamons declined. At trial, the Government revealed that Lamons had previously put in a request on September 10, 2001 for "buddy pass" airplane tickets for his relatives to attend the funeral of his uncle.

4

warning once more before the line went dead. Miller quickly determined that Flight 278 was about to depart from the adjacent gate, Gate C-12, and immediately alerted her supervisor. By the time Miller walked over to Gate C-12, Flight 278 had been evacuated. The flight's crew and passengers stood in the waiting area. Miller observed Lamons, whom she did not know at the time. He was crying and telling others that he did not want to fly to Boston. Nothing was wrong with the aircraft and no bomb was ever discovered. Flight 278 departed for Boston with a different aircraft and the same crew, sans Lamons, who said that he was too upset to fly.

The Lavatory Fire

Lamons was the lone flight attendant assigned to Comair Flight 5491 on May 8, 2003, which departed Atlanta at about 7:25 p.m. for Huntsville, Alabama. The aircraft was a small regional jet, with one lavatory located in the tail section. The flight was nearly full that day. Apart from Lamons, the only other crew were Captain James Todd Stegall and First Officer Tom Thurmbuchler. It was an unusually hot day. With several of the passengers complaining of the heat, Lamons distributed drinking water prior to take-off. Many passengers noticed an acrid smell while the airplane was still on the ground; some believed it was smoke, while others believed it was the smell of jet fuel. The smell dissipated prior to

5

take-off.

Just five or six minutes after take-off, Lamons notified Captain Stegall over the intercom (which was next to the cockpit door at the front of the plane) that he had noticed smoke in the lavatory. The aircraft was equipped with smoke and fire detectors throughout the plane, including in the lavatory, but none of those instruments indicated any fire at that time (or at any other time during the flight, for that matter), so Captain Stegall ordered Lamons to return to the lavatory to ascertain additional details, including the source of the smoke, whether there was a wisp of smoke or just the smell of smoke, and whether there was any heat associated with the smoke. According to Sheila Kliemann, a former flight attendant and in-flight operations specialist with Comair who spoke with Lamons later that evening, Lamons claimed to have seen a "light haze" in the lavatory at that time. Lamons called Captain Stegall a few minutes later and told him that it was "definitely smoke" and there was "heat near the floor." From this latter fact Captain Stegall deduced that the source of the smoke was likely a fire. Furthermore, Captain Stegall knew that there were flight control cables routed directly underneath the lavatory floor. He was also aware that hydraulic, electric, pneumatic, and fuel lines could be routed through that same area. First Officer Thurmbuchler testified that they took the report of smoke very seriously because a

6

fire is "one of the worse [sic] things that can happen on an aircraft." Accordingly, Captain Stegall and First Officer Thurmbuchler decided it was necessary "to declare an emergency and divert to landing as soon as possible."

Lamons asked Captain Stegall whether he ought to use a fire extinguisher. Captain Stegall responded affirmatively, but did not specify whether Lamons should use a water fire extinguisher or a halon fire extinguisher.[2] Lamons later told Kliemann that the haze had gotten thicker by that point. At no time, however, did Lamons don portable breathing equipment or a mask for his protection. He claimed that when he opened the compartment underneath the sink, he perceived ashes but no flames. He then grabbed the water fire extinguisher and sprayed the ashes.[3]

---

[2] Captain Stegall testified that a halon fire extinguisher suppresses fires by means of a gas, and that a water fire extinguisher should not be used on electrical equipment fires.

[3] Lamons related somewhat different accounts of the incident to Tracey Tribble and Jennifer Reed, Kliemann's supervisors who each spoke separately with Lamons on the evening of May 8 and during a debriefing on May 9. According to Tribble and Reed, Lamons said that he noticed that it was extremely hot on board the aircraft during boarding. Lamons notified the crew a couple of times as to the heat. During the taxi out, prior to take-off, a female passenger informed Lamons that she smelled smoke. After take-off, a male passenger named Bob Giesen and another female passenger also complained to Lamons of the smell, at which time Lamons immediately went to the lavatory to investigate. At this point, the accounts related by Tribble and Reed diverge. Tribble testified that Lamons told her that he perceived smoke issuing from the waste bin. Lamons then asked the crew whether he should use the fire extinguisher, which they approved. Lamons opened the waste bin and discharged the water fire extinguisher, then notified the crew that the smoke was gone and he believed the aircraft could continue on to Huntsville. The crew responded that the emergency landing would proceed.
Giesen testified at trial and denied ever having reported the smell of smoke. He did not

After declaring an emergency, Captain Stegall asked for an immediate descent to a lower altitude so as to receive vectors and radar coverage, and worked with air traffic control to choose the closest airfield that was suitable for their landing needs, an airfield with available runway lights and fire trucks. That airfield was Russell Field in Rome, Georgia. Captain Stegall and First Officer Thurmbuchler then initiated the "toilet smoke procedure," which entailed running through a lengthy checklist of actions, such as pulling circuit breakers, designed to identify and eliminate the potential sources of the problem. They were not able to locate the source of the problem.

Captain Stegall recalled speaking with Lamons one more time prior to

---

even realize there was smoke on the plane. He testified that he spoke to Lamons only to thank him for handing out drinking water to the passengers.

According to Reed, Lamons told her that he did not see any smoke or flames when he first opened the lavatory door. Lamons called Captain Stegall and informed him of his concerns, to which Captain Stegall replied that there might be smoke or fire in the cargo department (behind the lavatory) and asked him to check that general area. Lamons complied. After feeling around the cargo area, Lamons returned to the lavatory and still did not see any smoke or flames. He checked the lavatory waste bin, and did not see any smoke or flames. Then he opened the compartment under the sink and saw a haze and smoke down by the floor. Lamons reported his findings to Captain Stegall, then used the water fire extinguisher to spray the area under the sink. Ashes flew out. He then retrieved the halon fire extinguisher from the front of the cabin and spoke with Captain Stegall again. Captain Stegall informed him they would be landing. Assuming they would be returning to the same airport, Lamons announced to the passengers that they would be landing in Atlanta. Lamons checked the lavatory once more and did not find smoke or flames. Seeing water on the floor, he used a paper towel to wipe it up, which also picked up ashes. He threw the paper towels into the waste bin.

Also according to Reed, Lamons told her that fire officials asked him some time after the emergency landing whether he had accidentally started the fire. Lamons replied that he did not have anything with which to start a fire. Without being asked to do so, Lamons emptied his pockets, took off his shoes, and invited the officials to search his baggage.

8

landing to receive a status report and to ensure that the cabin was secure and the passengers were prepared. Lamons replied over the intercom that as far as he could tell from his vantage point at the front of the plane, things were not getting worse at least. The plane landed at 7:45 p.m. Captain Stegall decided to taxi off the runway to the ramp. Captain Stegall again asked Lamons whether things were getting worse and whether there was any more smoke, to which Lamons replied negatively. The crew and passengers then deplaned through the main cabin door and clustered in one area in front of the plane at a safe distance. A couple of minutes later, the fire department arrived.

Captain Stegall accompanied another firefighter and the Rome fire marshal, Vann Baxter, aboard the plane to examine and collect physical evidence. There was a water fire extinguisher on the floor of the cabin. Inside the lavatory, there was water, a small amount of ash, and bits of charred newspaper on the floor. There was a larger fragment of charred newspaper on top of the sink. In the compartment beneath the sink was more water, ash, and pieces of charred newspaper, as well as a partially burned and melted HVAC hose. A panel of the compartment door also featured a burn pattern about the size of a basketball. In the waste bin next to the sink, beneath some wet paper towels, was a partially burned and singed newspaper. There was a heat sensor and a halon fire

9

extinguishing system in the area directly above the waste bin, but the system had never been triggered; the plastic liner of the waste bin was also fully intact. As an expert in the field of arson investigation, Baxter testified at trial that a fire had been deliberately set by applying an incendiary device to newspaper in the compartment beneath the lavatory sink. He opined that the fire was set during flight and had burned for less than five minutes. He also deduced that no fire had been burning in the waste bin.

Detective David Stewart was one of the law enforcement officers who was called to respond to the emergency landing at Russell Field that evening. After taking photographs of the aircraft lavatory, Detective Stewart spoke with Lamons as they walked through the airport. Lamons told Detective Stewart that he believed 90% of all aircraft fires originate in the lavatory, and that his roommate was also a flight attendant and had encountered three such fires.[4] Later that evening, Agent Michael Rotti also interviewed Lamons. He asked Lamons whether he had placed or otherwise touched the newspaper in the waste bin. Lamons denied it.

---

[4] Lamons' roommate testified that he had never had a fire in the lavatory of an aircraft he was on.

On May 20, Agent Steven Lazarus took Lamons' fingerprints[5] and asked him whether he placed the newspaper in the waste bin.  Lamons replied that he had, and also denied that he had ever made a denial to Agent Rotti.  Lamons asked Agent Lazarus whether he was a suspect in the case.  Agent Lazarus responded that he was a suspect for two reasons: the evidence suggested no one else had the opportunity to set the fire,[6] and Lamons was making inconsistent statements concerning the incident.  Lamons then said, "Sir, I did not purposely start that fire."  Agent Lazarus asked, "Well, does that mean you accidentally started the fire?  Would you like to talk about that?"  Lamons repeated, "Sir, I did not purposely start that fire."  Agent Lazarus tried again: "Do you want to tell me you started this thing accidentally?  Let's stop this thing before it gets too big."  Lamons repeated once more, "Sir, I did not purposely start that fire."  The

---

[5] Three fingerprints belonging to Lamons were discovered on the partially burned and singed newspaper that was taken from the waste bin in the lavatory.

[6] Passengers who were seated directly in front of the lavatory testified at trial that no one went into the lavatory during the entire flight except Lamons, who was observed making numerous trips into the lavatory prior to take-off and during flight.  One passenger who had taken the twenty-eight-minute flight from Atlanta to Huntsville an average of fifty times a year for several years immediately perceived that Lamons was behaving erratically in making multiple trips up and down the aisle.  As soon as the airplane had achieved the altitude of 10,000 feet and the chimes sounded indicating that the passengers were free to move about the cabin, Lamons unbuckled his seat belt "and like a shot, he got up and walked immediately to the back of the plane."  It was not part of a flight attendant's responsibilities to inspect the lavatory after take-off.  Another passenger testified that after take-off, she saw Lamons kneeling on one knee in the lavatory with the other leg stretched out behind him, holding the lavatory door open.  She could not perceive what he was doing inside the lavatory.

11

interview then concluded.

## B.

A Northern District of Georgia grand jury returned a five-count indictment against Lamons. The first three counts related to the Comair incident, while the latter two counts related to the earlier AirTran incident. Count 1 charged Lamons with violating 49 U.S.C. § 46504 by interfering with the crew members of Comair Flight 5491, namely by intimidating them through the setting of fire to the aircraft.[7] Count 2 alleged that Lamons willfully set fire to Comair Flight 5491, a civil aircraft in interstate commerce, in violation of 18 U.S.C. §§ 32(a)(1) and 32(a)(7).[8] Count 3 alleged that Lamons knowingly and unlawfully used fire in

---

[7] 49 U.S.C. § 46504 prohibits persons on aircrafts in the special aircraft jurisdiction of the United States from "assaulting or intimidating" (as well as attempting or conspiring to assault or intimidate) flight crew members in a way that "interferes with the performance of [their duties] . . . or lessens [their] ability . . . to perform those duties." Count 1 included special findings that: "a. the offense involved intentionally endangering the safety of an aircraft; and b. a dangerous weapon was used."

[8] As it then read in relevant part, 18 U.S.C. §§ 32(a)(1) and 32(a)(7) make it a crime if one willfully –

(1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce; . . . [or]
(7) attempts or conspires to do anything prohibited under . . . this subsection.

Count 2 included special findings that: "a. the offense created a substantial risk of death or serious bodily injury to a person other than a participant in the offense"; that "b. . . . was created knowingly; and c. the offense endangered an aircraft."

12

connection with the Comair incident to commit a felony prosecutable in federal court, in violation of 18 U.S.C. § 844(h)(1).[9]  Count 4 charged Lamons with willfully and maliciously conveying false information concerning a false threat to AirTran Flight 278, in violation of 18 U.S.C. § 35(b).[10]  And finally, Count 5 charged Lamons with willfully and maliciously using a cellular telephone in conveying false information concerning an alleged attempt to kill and injure persons aboard AirTran Flight 278 "by means of fire and explosive," in violation of 18 U.S.C. § 844(e).[11]

---

[9] 18 U.S.C. § 844(h)(1) prohibits the use of "fire or an explosive to commit any felony which may be prosecuted in a court of the United States."

[10] 18 U.S.C. § 35(b) prohibits "willfully and maliciously, or with reckless disregard for the safety of human life, . . . convey[ing] or caus[ing] to be . . . conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt . . . to do any act" proscribed by 18 U.S.C. §§ 31 et seq., §§ 1991 et seq., or §§ 2271 et seq.  The indictment identified 18 U.S.C. §§ 32(a)(1) and 32(a)(5), which as they then read, made it a crime if one willfully –

> (1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce; . . . [or]
> (5) performs an act of violence against or incapacitates any individual on any such aircraft, if such act of violence or incapacitation is likely to endanger the safety of such aircraft.

Count 4 included special findings that: "a. the offense resulted in substantial disruption of business functions and services; b. the offense resulted in a substantial expenditure of funds to respond to the offense; and c. the offense involved multiple victims."

[11] 18 U.S.C. § 844(e) provides that

> Whoever, through the use of . . . telephone, . . . in or affecting interstate or foreign commerce, willfully makes any threat, or maliciously conveys false information

13

Lamons was initially tried on all five counts in a jury trial beginning on October 4, 2004. During trial, Lamons moved to sever the counts relating to the Comair incident from the counts relating to the AirTran incident.[12] The district court granted the motion and the case was submitted to the jury on the AirTran-related counts only. The jury was unable to agree upon a verdict after a day's deliberation, and on October 14, 2004, the district court entered an order declaring a mistrial. In Lamons' second trial beginning on March 22, 2005, a jury found Lamons guilty of Count 4 and not guilty of Count 5. In a subsequent trial beginning on May 8, 2006,[13] a jury returned a guilty verdict as to Counts 1, 2, and 3.

---

knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive shall be imprisoned for not more than 10 years or fined under this title, or both.

[12] Lamons filed a pretrial motion under Fed. R. Crim. P. 14 to sever Counts 1 through 3 from Counts 4 and 5, on the grounds that the counts were not properly joined under Fed. R. Crim. P. 8(a) because the AirTran and Comair incidents were not "of the same or similar character," "based on the same act or transaction," or part of a "common scheme or plan." Fed. R. Crim. P. 8(a). The district court denied the motion, concluding that joinder of the counts was appropriate because they were of a similar character: the "offenses charge Defendant with committing acts designed to disrupt, or that disrupted, commercial aviation."

This second motion to sever the counts, made during trial, was on the basis of Lamons' intent to testify with respect to the AirTran incident, but not with respect to the Comair incident. Although Lamons testified in the first trial, he did not testify in either the second or third trials.

[13] This third trial was originally set for May 23, 2005, but was delayed due to two continuances, the withdrawal of defense counsel, and the reassignment of the case due to the recusal of the trial judge.

The district court sentenced Lamons to a term of 151 months' imprisonment for each of Counts 1 and 2, to be served concurrently, and 60 months' imprisonment on Count 4, to be served concurrently with Counts 1 and 2. Lamons also received a term of 120 months' imprisonment for Count 3, to be served consecutively to the terms imposed on Counts 1, 2, and 4. Lamons therefore received a total term of 271 months' imprisonment.[14]

## II.

## A.

Lamons contends that the district court erred by admitting certain evidence in violation of the Confrontation Clause of the Sixth Amendment. Specifically, he contends that the introduction of Exhibit 2, a compact disc of data collected from telephone calls made to AirTran in September 2001, and Exhibit 3, a call report created from the compact disc, amounted to testimonial hearsay not properly admissible under Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."). He further claims that

---

[14] The district court also ordered restitution in the amount of $43,703.35 and a special assessment of $400.

the district court abused its discretion by admitting the exhibits under the business record exception to the hearsay rule, Fed. R. Evid. 803(6).[15]  We find it unnecessary to address either charge, however, because we conclude that both pieces of evidence in question are not "statements" within the meaning of the Confrontation Clause or Federal Rule of Evidence 801(a).  We begin by describing the manner in which the exhibits were created.

On the morning of September 18, 2001, Rocky Wiggins, the Chief Information Officer of AirTran, was notified that a threatening call had been made to Gate C-10 at about 8:15 a.m.[16]  Wiggins initiated a Call History Interrogation ("CHI") on AirTran's internal telephone records to find any calls that were

---

[15] "The district court has broad discretion in ascertaining admissibility of business record evidence, which should not be disturbed on review in absence of abuse."  United States v. Garnett, 122 F.3d 1016, 1018 (11th Cir. 1997) (per curiam).  Even if the evidence was improperly admitted as business record evidence, we will not find an abuse of discretion if it was properly admitted on other grounds.  See United States v. Paradies, 98 F.3d 1266, 1290 (11th Cir. 1996).  We review de novo the question of whether hearsay statements are "testimonial" for purposes of the Confrontation Clause.  See United States v. Underwood, 446 F.3d 1340, 1345 (11th Cir. 2006).

[16] At trial, Wiggins testified that there were only two ways to reach an AirTran departure gate telephone, both of which required knowledge of the unique four-digit extension number assigned to that departure gate.  These extension numbers – like all of AirTran's internal extension numbers – were not made available to anyone other than AirTran employees.  The first method was to dial the extension number from a "direct inward dial" AirTran company phone, of which there were very few.  The second method was to dial the toll-free number for AirTran's corporate headquarters in Orlando, Florida (which was published), and then to enter the extension number (which was not published) when prompted by the automated interactive voice response ("IVR") system.  This latter method was intended to permit AirTran employees to reach other AirTran employees without having to dial long-distance numbers.

16

answered at Gate C-10 between 8:05 a.m. and 8:25 a.m.[17]  According to the CHI

report, there was just one such call.  That call was transferred from Sprint to

AirTran's corporate toll-free number at 8:16:48 a.m., was answered by the

interactive voice response ("IVR") system at 8:16:52 a.m., and was transferred

over to Gate C-10.  The telephone at Gate C-10 began to ring at 8:16:58 a.m. and

was answered by someone at 8:17:10 a.m.  The call itself ended six seconds later

at 8:17:16 a.m.[18]

Several months before Lamons' trial in March 2005, Agent Lazarus

contacted Wiggins requesting the monthly billing records sent to AirTran from its

telephone provider, Sprint, for the month of September 2001.  Wiggins was able to

retrieve the desired billing CD, Exhibit 2, from AirTran's Iron Mountain archives,

but was not able to access the information on Exhibit 2 because AirTran no longer

---

[17] The CHI report was admitted into evidence without objection.

[18] Wiggins more fully described the functioning of AirTran's telecommunication systems at trial.  As of September 2001, AirTran automatically captured data from each telephone call and transferred them into a database where the data elements would be saved and archived for 60 days.  Such data included which circuit the call originated from, the time the call originated, how long the telephone rang before it was answered, when the telephone was answered, when the call was terminated, and which agent answered the call.  The system did not then have the capacity to trace incoming calls back to the number of origin, i.e., caller ID.  The most that the system could trace was the time that the long-distance provider transferred the call to AirTran's internal switch, as well as any subsequent internal transfers.  Wiggins testified that the system was primarily intended to monitor line usage in case more circuits were needed, and to monitor the performance of agents for productivity reasons.
Wiggins explained that the times on the CHI report were according to AirTran's internal clock, which was not synchronized to Sprint's internal clock.

retained a copy of the Fonview computer program, the appropriate software necessary to read and format the raw data in Exhibit 2. Wiggins gave Exhibit 2 to Agent Lazarus, who contacted Sprint. Sprint in turn directed Agent Lazarus to CTI Group, the software development company that had developed Fonview.

In 2001, CTI Group was an independent contractor for Sprint. Agent Lazarus contacted Penny Burden, a Senior Technical Report Representative for CTI Group, for assistance in converting Exhibit 2 to a readable format. At trial, Burden explained the process by which CTI Group generally produced billing CDs for Sprint. Sprint would generate the raw billing data for its customers on large data reels, which were sent directly to CTI Group.[19] CTI Group's processing department would then use an automated system to put the raw data from the reels on to billing CDs such as Exhibit 2.

Burden testified that she received a copy of Exhibit 2 from Agent Lazarus. Burden then used the Fonview software to decrypt and read the data from the duplicate CD. Using Fonview, Burden read and printed out (in spreadsheet form) some of the data appearing on the duplicate CD – namely, the data for calls made

---

[19] According to Penny Burden, the raw data is written in either ASCII (American Standard Code for Information Interchange) or EBCDIC (Extended Binary Coded Decimal Interchange Code).

to AirTran's corporate toll-free number on September 18, 2001.[20]  This printout

was designated as Exhibit 3.  According to Exhibit 3, there were ten calls

originating from Lamons' cell phone number that were answered by the IVR at

AirTran's corporate toll-free number between 8:04 a.m. and 8:23 a.m.  One of

those calls, made at 8:16 a.m., lasted approximately half a minute from the time it

was answered by the IVR until the call was terminated.[21]

In order for Lamons' arguments to have purchase, the evidence challenged

must first qualify as the kind of statements that fall within the scope of the

Confrontation Clause.  The text of the Confrontation Clause indicates that "[i]t

applies to 'witnesses' against the accused – in other words, those who 'bear

testimony.'"  Crawford, 541 U.S. at 51, 124 S. Ct. at 1364 (quoting 2 N. Webster,

An American Dictionary of the English Language (1828)).  In addition, the

---

[20] Burden explained that Fonview is a billing analysis tool that permits its users to generate reports from a billing CD in a readable format without changing the underlying data. Burden subsequently used Fonview to read and print the same information from Exhibit 2, and then confirmed that the information on this second printout was identical to the first printout from the duplicate CD.

[21] Lamons' cell phone bills from the relevant billing month were admitted as Exhibit 9 without objection.  According to those records, eleven calls were made from Lamons' cell phone to AirTran's corporate telephone number between 8:06 a.m. and 8:22 a.m.  (The duration of one of those calls was only five seconds.)  The records also indicated that each of those calls to AirTran's corporate telephone number was preceded by the code "*67," which prevents the caller's number and name from being displayed on the recipient's caller ID device.  That code was not dialed on any other call from Lamons' cell phone to AirTran's corporate telephone number during that billing month.

"principal evil" with which the Confrontation Clause was concerned was "the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." Id. at 51, 124 S. Ct. at 1363. In light of the constitutional text and the historical focus of the Confrontation Clause, we are persuaded that the witnesses with whom the Confrontation Clause is concerned are human witnesses, and that the evidence challenged in this appeal does not contain the statements of human witnesses. See United States v. Moon, 512 F.3d 359, 362 (7th Cir. 2008); United States v. Washington, 498 F.3d 225, 231 (4th Cir. 2007).

The Federal Rules of Evidence define a "statement" as an "(1) oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a) (emphasis added). See Washington, 498 F.3d at 230 n.1 ("While the hearsay rules of the Federal Rules of Evidence do not formally demarcate the scope of 'statements' for Confrontation Clause purposes, we take this definition to be uncontroversial, especially since the Sixth Amendment provides the right to confront (human) 'witnesses.'");[22] see also

_____

[22] In United States v. Washington, 498 F.3d 225 (4th Cir. 2007), Washington was charged with driving under the influence and unsafe operation of a vehicle. Id. at 227. At trial, the district court admitted the testimony of the Government's expert, Dr. Levine, who testified that a blood sample taken from Washington contained drugs and alcohol. Id. Washington claimed that the admission of Dr. Levine's testimony violated his Sixth Amendment rights because the doctor relied upon reports of raw data "generated by the lab's diagnostic machines, operated by various

20

Moon, 512 F.3d at 362 ("A physician may order a blood test for a patient and infer from the levels of sugar and insulin that the patient has diabetes. The physician's diagnosis is testimonial, but the lab's raw results are not, because data are not 'statements' in any useful sense.").

We have no difficulty concluding that the statements in question are the statements of machines, not statements of persons.[23] Lamons makes much of the fact that it was Agent Lazarus who requested the production of the evidence; but the relevant point is that no human intervened at the time the raw billing data was

_____

lab technicians," and such reports were testimonial hearsay. Id. at 229. Observing that "the 'statements' in question are alleged to be the assertions that Washington's blood sample contained PCP and alcohol," the Fourth Circuit found that these were statements "of the machines themselves" on printed sheets, not the statements of the machine operators. Id. at 229–30.

[23] To be sure, there can be no statements which are wholly machine-generated in the strictest sense; all machines were designed and built by humans. But certain statements involve so little intervention by humans in their generation as to leave no doubt that they are wholly machine-generated for all practical purposes. See United States v. Khorozian, 333 F.3d 498, 506 (3d Cir. 2003) (finding that a fax header is not a hearsay statement because it is not "uttered by 'a person,' [and] nothing 'said' by a machine . . . is hearsay.'" (quoting 4 Mueller & Kirkpatrick, Federal Evidence § 380, at 65 (2d ed. 1994))); People v. Holowko, 486 N.E.2d 877, 879 (Ill. 1985) ("The evidence [the results of an electronic "trap" or "tracer" placed on a telephone] is generated instantaneously as the telephone call is placed, without the assistance, observations, or reports from or by a human declarant. The printouts of such data are merely the tangible result of the computer's internal operations."); cf. United States v. Vela, 673 F.2d 86, 90 (5th Cir. 1982) (noting district court's observation that telephone bills "would be even more reliable than . . . average business record[s] because they are not even touched by the hand of man") (alteration in original and internal quotation marks omitted).

"stated" by the machine – that is, recorded onto Sprint's data reels.[24]  The process by which the data was extracted from the reels and placed onto compact CDs such as Exhibit 2 was similarly fully automated.  Finally, Burden did not alter the underlying data on Exhibit 2 when she created a printout of calls made to AirTran's corporate telephone number on September 18, 2001 (Exhibit 3); she merely utilized Fonview in pre-programmed fashion to read the encrypted data on Exhibit 2 and to format the data so as to indicate the relevant portion.[25]

_____

[24] These are not, for example, "computer data compilations" of records manually inputted into a computer by human declarants.  See, e.g., Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir. 1980) ("Under Rule 803(6), computer data compilations may be business records themselves, and should be treated as any other record of regularly conducted activity.").

In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[25] These exhibits occupy the far end of the spectrum.  At the other end of the spectrum, no one can seriously doubt the proposition that this opinion itself is a wholly human-generated statement, despite the fact that a machine – a word processor on a computer – aided its production.  The characterization of statements toward the middle of the spectrum, which includes statements that may have been generated through the contemporaneous lens of human interpretation and analysis, poses a more difficult problem.  See, e.g., Wimbish v. Commw., No. 2873-06-3, 2008 Va. App. LEXIS 168, at *13 n.2 (Va. Ct. App. Apr. 8, 2008) ("[C]ourts in other jurisdictions have held certain types of scientific reports to be testimonial.  However the reports in those cases were generally either produced or interpreted by a scientist or a technician.").  We express no opinion as to the proper treatment of scientific reports generally.

We note that the Supreme Court has granted certiorari in Melendez-Diaz v. Massachusetts, 128 S. Ct. 1647, 170 L. Ed. 2d 352 (2008), to determine whether state forensic laboratory reports prepared for use in criminal prosecution are testimonial statements subject to the Confrontation Clause.  In that case, the defendant objected to the admission of drug analysis certificates purportedly establishing that plastic bags seized by police officers contained cocaine.  See Pet. for a Writ of Cert., Melendez-Diaz v. Massachusetts (No. 07-591), App. A at 8a.  Because "[t]he grant of certiorari on an issue does not suggest a view on the merits," Schwab v. Sec'y, Dep't of Corr., 507 F.3d 1297, 1299 (11th Cir. 2007) (per curiam), and in any case the nature of the evidence in Melendez-Diaz is so different from Exhibits 2 and 3, we see no need to

22

The exemption of machine-generated statements from the purview of the

Confrontation Clause also makes sense in light of the purposes of confrontation.

Although the right to subject witnesses to the crucible of cross-examination has

some symbolic purpose in promoting the "perception as well as the reality of

fairness," it

> is primarily a functional right that promotes reliability in criminal
> trials. . . . [Confrontation] (1) insures that the witness will give his
> statements under oath – thus impressing him with the seriousness of
> the matter and guarding against the lie by the possibility of a penalty
> for perjury; (2) forces the witness to submit to cross-examination, the
> 'greatest legal engine ever invented for the discovery of truth'; (3)
> permits the jury that is to decide the defendant's fate to observe the
> demeanor of the witness making his statement, thus aiding the jury in
> assessing his credibility.'

Lee v. Illinois, 476 U.S. 530, 540, 106 S. Ct. 2056, 2062, 90 L. Ed. 2d 514 (1986)

(quoting California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935, 26 L. Ed.

2d 489 (1970)) (internal quotation marks omitted). These purposes are ill-served

through confrontation of the machine's human operator. To say that a wholly

machine-generated statement is unreliable is to speak of mechanical error, not

mendacity. The best way to advance the truth-seeking process with respect to

such statements is not through cross-examination of the machine operator, but

through the process of authentication as provided for in Federal Rule of Evidence

---

await the Supreme Court's determination.

901(b)(9) (setting forth as an example of authentication "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result"). Washington, 498 F.3d at 231; id. at 230 ("The value of cross-examination might relate to authentication or to a description of the machines or to the chain of custody, but none of these were issues at trial, nor are they issues on appeal. Whether the machines properly reported PCP or alcohol is determined by the raw data that the machines generated, and its truth is dependent solely on the machine."); see also Moon, 512 F.3d at 362 ("If the [machine] readings are 'statements' by a 'witness against' the defendants, then the machine must be the declarant. Yet how could one cross-examine a gas chromatograph? Producing spectographs, ovens, and centrifuges in court would serve no one's interests. . . . The vital questions – was the lab work done properly? what do the readings mean? – can be put to the [proponent] on the stand.").

Accordingly, we conclude that the district court did not err in admitting Exhibits 2 and 3.

### B.

In a pre-arrest interview, Lamons told Agent Lazarus that he "did not purposely start that fire." Agent Lazarus asked him if he meant he had accidentally started the fire, to which Lamons repeated two more times: "Sir, I did

24

not purposely start that fire." Anticipating that Lamons would advance at trial the argument that the fire was inadvertently set, the Government gave notice of its intent to use evidence of Lamons' prior conviction with respect to the AirTran incident to prove his criminal intent, knowledge, and the absence of mistake or accident. Before the presentation of evidence at Lamons' trial on the Comair counts, the district court granted the Government's motion in limine to admit the evidence. The district court permitted the evidence "in connection with the material element of the current offense of intent that is similar in nature in that it deals with the disruption of air traffic." The evidence was published to the jury at the close of the Government's case in chief. During the jury charge, the district court gave a limiting instruction with respect to the evidence.

Lamons claims that the district court abused its discretion in admitting the evidence of his prior conviction in violation of Federal Rule of Evidence 404(b).[26] Admissibility under Rule 404(b) is governed by a three-part test:

---

[26] Rule 404(b) provides that

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). "We review the district court's admission of prior crimes or bad acts under Federal Rule of Evidence 404(b) for abuse of discretion." United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005).

(1) the evidence must be relevant to an issue other than defendant's character;
(2) the probative value must not be substantially outweighed by its undue prejudice; [and]
(3) the government must offer sufficient proof so that the jury could find that defendant committed the act.

United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005); see also United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc); United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

Lamons does not dispute the third prong, as well he could not; "[i]t is elementary that a conviction is sufficient proof that [the defendant] committed the prior act." United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir. 1997) (citing United States v. Arambula-Ruiz, 987 F.2d 599, 603 (9th Cir. 1993)). Rather, he contends that the evidence was not admissible for any proper purpose and that any probative value was substantially outweighed by its prejudicial effect. The Government contends that the evidence was relevant to two issues: Lamons' intent to commit the offenses charged and the absence of mistake or accident.

We conclude that the district court did not abuse its discretion in admitting the evidence. Lamons' primary defense at trial was that he did not set the fire, and that the fire was started by someone else with access to the aircraft prior to take-off. Agent Lazarus' testimony as to Lamons' statements was clearly relevant with

26

respect to whether Lamons (as opposed to someone else) had in fact set the fire, as the statements permit the inference that Lamons was conscious of having done the act; at trial, the Government introduced the statements in its case in chief and characterized the statements as a "back-handed confession" by Lamons. However, the statements also raise the issue of whether Lamons willfully set fire to the aircraft, particularly as he thrice stated that he had not "purposely" done so. The Government did not present any evidence that directly refuted the possibility that the fire was accidentally set; the evidence therefore remained subject to an innocent interpretation. Indeed, Lamons' comments to Detective Stewart about his roommate and lavatory fires in general tended to suggest that lavatory fires were a fairly common occurrence. The Government then introduced evidence of Lamons' prior conviction at the close of its case in chief. Rather than creating a primary inference of Lamons' character or his propensity to commit criminal acts, the evidence instead permitted the inference that Lamons deliberately set the fire based on the improbability of accident. See United States v. Greenwood, 796 F.2d 49, 53 (4th Cir. 1986) ("The existence of prior similar wrongdoings reduces the plausibility of a defense of inadvertence or accident. The attempt to cover up an erroneous FBI meal reimbursement is clearly relevant to the absence of mistake in the closely related context of FBI rent and hotel reimbursements." (citation

27

omitted)); cf. United States v. Matthews, 431 F.3d 1296, 1313 n.1 (11th Cir. 2005) (Tjoflat, J., specially concurring) (noting that evidence of an extrinsic offense "is more appropriately admissible for non-propensity purposes," such as establishing intent, where "an inference can be drawn that says nothing about the defendant's character, for example, based on the 'improbability of coincidence'") (citation omitted).

We cannot say that the probative value of the evidence was substantially outweighed by its prejudicial effect. Measured in terms of the incremental significance to the Government's case, the overall similarity of the extrinsic and charged offenses, and the temporal distance between the two, the probity of the evidence was significant. See United States v. Parr, 716 F.2d 796, 805 (11th Cir. 1983). Far from being cumulative or of marginal value to the Government's case, the Government's need for the evidence was strong; it may have been determinative of the issue of willfulness. See Beechum, 582 F.2d at 917. The probative value of the evidence is enhanced by the overall similarity between the physical elements of the two incidents. Despite the difference in certain instrumentalities – one a telephone call, the other a fire – the incidents resemble each other in their distinctive means and ultimate purpose. Both were unlawful acts committed in Lamons' capacity as a flight attendant, targeting commercial

28

aircraft and passengers, that were designed to disrupt commercial aviation.[27] Cf.

Parr, 716 F.2d at 805 ("As to similarity, both offenses, while far from identical,

involve developing the appearance of value that can be used as purchasing power

but which is in fact devoid of value."). Nor did temporal remoteness diminish the

probity of the evidence; the conduct underlying the prior conviction occurred less

than two years prior to the Comair incident. See United States v. Edouard, 485

F.3d 1324, 1346 (11th Cir. 2007). Any prejudicial value was further reduced by

the limiting instruction given by the district court during the jury charge. Id.

Accordingly, the evidence was properly admitted under Rule 404(b).

## III.

Lamons raises two challenges to his sentence, only one of which merits

discussion.[28] He claims that there was insufficient evidence for the district court

---

[27] Contrary to Lamons' suggestion that his prior conviction would be relevant for this purpose only if he "were charged [with respect to the Comair incident] with willfully conveying false information and he claimed he did not know the information to be false," perfect equivalence between the physical elements of the extrinsic and charged offenses is not required; rather, we assess their overall similarity. Beechum, 582 F.2d at 912 n.15 ("[T]he meaning and nature of the 'similarity' requirement in extrinsic offense doctrine are not fixed quantities. Each case must be decided in its own context, with the issue to which the offense is directed firmly in mind.").

[28] Lamons argues that his sentence was imposed in violation of the Fifth and Sixth Amendments and the rule of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), because his sentence was enhanced based on facts that were not presented to a grand jury, admitted during trial, or proven beyond a reasonable doubt. The argument is meritless. United States v. Thomas, 446 F.3d 1348, 1355 (11th Cir. 2006).

to apply a particular base offense level.

For purposes of sentencing, the presentence investigation report ("PSI") grouped Counts 1 and 2 together as related charges, and placed Count 4 in a group unto itself. U.S.S.G. § 3D1.2(a). Count 3 was not grouped. § 3D1.1(b)(1). With respect to the first group, the PSI applied § 2A5.2(a)(1). That provision prescribes a base offense level of 30 "if the offense involved intentionally endangering the safety of . . . an airport or an aircraft." Lamons argues that there was no jury finding that the act of knowingly and willfully setting a fire aboard an aircraft was tantamount to intentionally endangering the safety of the aircraft. He also points to the Government's theories at trial that Lamons set the fire and subsequently reported it either because he wanted to return to Atlanta, or because he wanted to be viewed as a hero. Lamons contends that under either theory, the Government stopped short of demonstrating that Lamons intended to compromise the integrity of the plane itself. At best, according to Lamons, such conduct amounts to only a reckless endangerment of the safety of the aircraft[29] – meriting a base offense level

---

[29] § 2A5.2 does not define "reckless." Taking a cue from the Ninth Circuit, however, we look to the commentary to U.S.S.G. § 2A1.4, concerning involuntary manslaughter, for guidance as to the definition of "reckless": "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, app. n.1. See United States v. Gonzalez, 492 F.3d 1031, 1036 (9th Cir. 2007);

of 18 under § 2A5.2(a)(2).

At the sentencing hearing, the Government responded that the base offense level was appropriately calculated because the jury found that Lamons intentionally set the fire and the fire "was by definition a danger to the aircraft." The district court denied Lamons' motion to reduce the base offense level to 18, explaining:

> The indictment charges that the defendant did willfully set fire to and damage this aircraft which is designated as Comair Airlines flight 5491. I don't recall in the evidence – I cannot find in any way that this was done other than knowingly and willfully. I find no hint of negligence in this. Therefore, I think the proper offense level is 30 as set out in the Guidelines.

Although at oral argument Lamons argued that the district court erred in its application of the Guidelines to the facts – a mixed question of fact and law which we review de novo, see United States v. Kinard, 472 F.3d 1294, 1296 n.3 (11th Cir. 2006) – his brief clearly only claims that the district court's factual determination that Lamons intentionally endangered the safety of the aircraft was not supported by a preponderance of the evidence – which we review for clear error, see id. – and does not challenge the court's application of § 2A5.2(a)(1).[30]

---

[30] Specifically, Lamons' brief states that "[t]here was never any evidence adduced at trial suggesting that Mr. Lamons intended to endanger the safety of the aircraft," and that "[t]he evidence adduced at Mr. Lamons' trial supports a finding of reckless endangerment."

31

Lamons cites one case in support of the proposition that the evidence demonstrated only reckless endangerment of an aircraft. In <u>United States v. Gonzalez</u>, a passenger began to complain of heart problems and requested oxygen. 492 F.3d 1031, 1032 (9th Cir. 2007). He then began walking up and down the aisle, demanding that the plane land, opening up overhead bins in an attempt to take out luggage, and saying something to the effect of having a bomb. <u>Id.</u> at 1033. Chaos ensued as passengers and flight attendants tried to restrain Gonzalez, who was trying to make his way to the emergency exit row. <u>Id.</u> As a result of Gonzalez's actions, the plane diverted from its planned course and "returned to Las Vegas without further incident." <u>Id.</u> at 1034. A panel of the Ninth Circuit held that "Gonzalez's irresponsible statements, threats and conduct easily qualified as reckless endangerment to 'the safety of . . . an aircraft' within the meaning of § 2A5.2(a)(2)." <u>Id.</u> at 1035.

<u>Gonzalez</u> is inapt because there was never any recommendation that the defendant in that case be sentenced for having intentionally endangered the safety of the aircraft. The standard applied in <u>Gonzalez</u>, which the court found was easily met, was whether Gonzalez should have been aware that the risk created by his conduct would endanger the safety of the aircraft. By contrast, in this appeal the evidence was more than sufficient to support the finding that Lamons

intentionally endangered the safety of the aircraft.  Lamons was a flight attendant who intentionally set fire to a small aircraft on which he was the only flight attendant.  He notified the flight crew of the existence of heat and smoke in the lavatory, an area of the aircraft which was situated above flight control cables and hydraulic, electric, pneumatic, and fuel lines.  Though the fire burned for less than five minutes, it was enough to partially burn and melt an HVAC hose.  Captain Stegall testified that he was unsatisfied with the vagueness of Lamons' initial description of the smoke, and that he sent Lamons back for more specifics; Lamons never informed Captain Stegall of the source of the smoke.  Lamons therefore both set a fire and created an unexplained source of smoke on the aircraft.  This was a report that the flight crew took very seriously; as First Officer Thurmbuchler testified, a fire is "one of the worse [sic] things that can happen on an aircraft."  The evidence also supported the finding that Lamons knew of the consequences of his actions; as Sheila Kliemann testified, smoke in the lavatory is an emergency situation that Comair flight attendants are trained to handle through a special procedure.

Operating on the basis that the unknown source could still be active, Captain Stegall and First Officer Thurmbuchler declared an emergency and immediately began searching for an airfield with available runway lights and fire

trucks. At the same time, they began performing the toilet smoke procedure. At no time while the aircraft was in flight did Lamons inform Captain Stegall that he had put out the fire; only after the aircraft had made its emergency landing at Russell Field did the crew learn that the fire had been extinguished. In short, Lamons set the fire and both reported and withheld enough details about it to cause the aircraft to divert to landing, which as Kliemann testified, qualifies as "a pretty big emergency."

We cannot say that the district court clearly erred in finding that a flight attendant who intentionally sets fire to an aircraft with the purpose of causing an emergency landing has intentionally endangered the safety of the aircraft. In addition to the immediate risk posed by the fire, both in terms of its potential physical consequences and the panic its existence might engender, cf. Gonzalez, 492 F.3d at 1038 ("An aircraft is a captive, closed environment in which the safety of the passengers and the integrity of the aircraft are closely intertwined. It doesn't take an aeronautical engineer to recognize that a threat of a bomb in [an airplane] environment and the havoc that such a threat might cause is a threat to the safety of the aircraft."), the safety of the aircraft was further endangered by the necessity of undertaking an emergency landing. See id. ("Gonzalez's conduct precipitated an emergency diversion of the aircraft and a return to Las Vegas. This

34

diversion was yet another risk to the aircraft caused by Gonzalez's escalating terror."). Nor does the fact that the fire did not cause more extensive damage or that the aircraft did not crash or otherwise suffer structural damage in making the emergency landing compel a finding otherwise. See id. at 1035 ("[E]ndangerment of the aircraft does not require evidence of actual harm to the aircraft."); United States v. Guerrero, 193 F. Supp. 2d 607, 609 (E.D.N.Y. 2002) ("Endangerment 'means a threatened or potential harm and does not require proof of actual harm.'" (quoting United States v. Poe, 215 F.3d 1335 (9th Cir. 2000))). We therefore affirm the district court's selection and application of § 2A5.2(a)(1) as the appropriate base offense level for the first group of charges.

## IV.

For the reasons herein stated, the judgment of the district court is AFFIRMED.