**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 15, 2024**

# In the Court of Appeals of Georgia

A24A1026. SIMON v. THE STATE.

PADGETT, Judge.

Kerlance Simon was found guilty of two counts of exploitation of an elderly person and two counts of financial transaction card theft by a jury in Forsyth County.[1] Simon appeals her convictions.

Viewed in the light most favorable to the verdict, *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), the evidence produced at trial showed that in 2020, Simon was employed as a patient care technician at a hospital located in Forsyth County and was assigned to work on the fourth floor of the hospital. In June 2020, D. P., one of the victims, was rather ill and sought treatment at the

---

[1] The trial jury found appellant not guilty of a third count of financial transaction card theft.

emergency room of the hospital. D. P. was admitted as a patient to that hospital and was assigned a room on the fourth floor. At the time of her admission into the hospital, D. P. was 71 years of age. The hospital employed COVID restrictions during this period of time which severely limited any family members or friends of patients being allowed to visit. The only personal item that D. P. took into the hospital with her was her cell phone and her purse which contained, among other things, her credit card and debit card. When D. P. was released from the hospital, she discovered that her debit card and a credit card were missing from her purse. D. P. reached out to her financial institution and learned that the debit card had been used at a retail store, some distance from the hospital, while she was incapacitated in the hospital.[2] She contacted law enforcement to report the theft at the suggestion of her financial institution. D. P. also contacted the store where the card had been used and the manager of the store agreed to hold the video from that transaction for law enforcement officials.

Later that year, in September 2020, N. H., another victim, became very ill, and she was admitted to the same hospital as D. P. At the time of her admission, N. H. was over 80 years of age. N. H. was also admitted to the fourth floor of the hospital. When

---

[2] There was no evidence presented to establish that D. P.'s credit card had been used, only her debit card was used without her permission.

she was admitted, N. H. took her purse with her, which contained, among other things, her credit cards. N. H. was very sick at the time of her admission into the hospital but once her medical condition began to improve, N. H. asked a hospital employee to go into the closet in her hospital room and give her access to her purse. Upon inspection, N. H. discovered that her credit card was missing along with some cash. N. H. became distraught and her adult daughter was allowed to visit her in the hospital to make all of the phone calls necessary to report the theft. Upon contacting her financial institution, N. H. learned that her credit card had been used on several occasions, on different dates, and at different retail stores while she was incapacitated in the hospital.

Law enforcement officials became involved and obtained copies of the receipts from the financial institutions who issued the cards in question. Upon learning the locations of the retail stores where the financial transaction cards had been used, law enforcement officials contacted those stores and began collecting video surveillance from the stores in an attempt to determine who had used the cards while the rightful owners were in the hospital. Employees of the different retail stores provided their relevant video surveillance to the investigators. All of these retail stores had some

form of video surveillance which depicted the transactions in question. Some of the stores also had video surveillance equipment located at the entrances and exits of the store and at least one had additional video surveillance recording the parking lot of the store. After obtaining the videos, law enforcement officers believed that the same individual was depicted in all of the store videos. Officers worked with the hospital security staff to determine if any managers within the hospital could identify the person depicted in the videos. Simon was eventually identified by her manager as the person depicted in the videos from the retail stores.

Law enforcement officials determined that Simon was the registered owner of a vehicle that matched the year, make, and model of the vehicle depicted in one of the videos from the retail stores. After obtaining Simon's cell phone number, a search warrant was issued to obtain her cellular call detail records ("CDR") and cell-site location information ("CSLI"). The records from the cellular service provider were compared to Simon's work schedule. Law enforcement officers learned that at the different dates and times the financial transaction cards were used, Simon was not at work. The data obtained from the cellular service provider was then uploaded into a program known as "CellHawk" to allow for a visual representation of the data

contained in the provider's records. Officers determined that the records from the cellular service provider indicated that Simon's cell phone was located near each of the different retail stores when the financial transaction cards were improperly used.

Simon testified at trial. She confirmed that she was present at the different retail stores when the financial transaction cards belonging to D. P. and N. H. were illegally used but denied stealing the cards from the patients. Simon testified that her presence at each store on the dates and times when the cards were used was merely a coincidence.

In what purports to be a single enumeration of error but which actually raises several independent issues, Simon claims that the trial court erred when it allowed the prosecution to display to the jury the data from the computer program CellHawk. We disagree.

We cannot find any precedent in Georgia where CellHawk has been examined or discussed by an appellate court. Before addressing the propriety of the trial court having allowed the State to display the results of the CellHawk data to the jury, it is important to understand what CellHawk is and how it works.

5

CellHawk is a web-based computer program into which an authorized user uploads CDR and CSLI obtained from a cellular service provider. The program is capable of reading the different fields within the data collected from the cellular service provider and can extract the CDR and CSLI data from the report without further human intervention. CellHawk then provides a visual representation or map of what the data shows. At its essence, CellHawk only makes a visual representation of data independently collected from a cellular service provider.

From the data collected from the cellular service provider, CellHawk then produces a map which plots points on the map, depicting where a cellular device was located at a given time, as determined by the relative location of the cellular tower on which the phone was pinging at that time. The user has the option of placing pins on the map which depict locations important to an underlying case to allow for an understanding of the relative proximity between the cell phone and the location where the user places a pin. CellHawk is developed by a private company and utilized by law enforcement agencies via a license that is purchased by that agency. There are other commercially available programs which are capable of producing similar results.[3]

_____

[3] Testimony was presented during the trial that at a prior point in time, officers could accomplish the same result by transferring the data collected from the cellular

CellHawk is completely dependent upon the information uploaded from the relevant cellular service provider. CellHawk does not independently report data that is not contained within the records of the cellular service provider or input by the user. CellHawk's accuracy is dictated by the information contained in the records supplied by the cellular service provider. CellHawk merely translates data from the cellular service provider, taking data contained within a spreadsheet format and converting that same data into a map that can be more easily understood and digested.

Examining CellHawk in the context of our rules of evidence, it is clear that CellHawk is merely a demonstrative exhibit as urged by the State and as found by the trial court. The data from which CellHawk produces a map is obtained from the cellular service provider - documents that are independently admitted into evidence. There is no tangible exhibit admitted into evidence based upon the maps created by CellHawk. Instead, the program is displayed via a computer connected to the internet during the trial and the corresponding maps are displayed to the jury. CellHawk is merely a more modern way of doing what has been done with paper maps and

service provider into a program such as Excel and then uploading the data into a program such as Google Earth, which would visually represent the same or similar information that is produced by CellHawk. However, use of Cellhawk allows law enforcement officer to avoid that time intensive work.

thumbtacks for generations. Accordingly, CellHawk is best described as a demonstrative aid which is not admitted into evidence and does not go out with the jury during deliberations. Having identified what CellHawk is and does, we now turn to Simon's arguments on appeal.

In this case, the State introduced approximately 470 pages of data contained within a spreadsheet from Simon's cellular service provider. The search warrant obtained by law enforcement officials asked for the CDR and CSLI relating to Simon's cell phone for a five day window surrounding the dates that D. P.'s and N. H.'s respective financial transaction cards were improperly used. The voluminous records showed when Simon's cell phone was used and also showed which cell phone tower the device was pinging at any particular point in time via the tower's longitude and latitude. The data from the cellular service provider also revealed the degree of location accuracy as to each entry within their records. However, that data was introduced in the form of a multi-page spreadsheet which lists the latitude and longitude of cell towers on which Simon's cell phone was pinging at that particular time. Simon concedes that the records of the cellular service provider were properly

admitted as business records under OCGA § 24-8-803(6) and properly authenticated under OCGA § 24-9-902(11).

During the trial, a law enforcement witness who was trained in digital forensic investigations and was also familiar with the operation of CellHawk was called to testify. The witness also testified in a more general manner about the way cell phones work, how phones connect or ping off of cellular towers, and other matters relating to how cellular networks work in general. The witness then testified that she had previously uploaded the records obtained from Simon's cellular service provider, and the prosecutor had the witness show, via CellHawk, what the records obtained from the cellular service provider revealed as to the location of Simon's cell phone during the relevant dates and times.

Simon claims on appeal that the law enforcement witness who testified lacked the requisite qualifications to be allowed to testify as an expert. During the trial, Simon specifically objected to the law enforcement witness testifying without being qualified as an expert. The State noted that they were not tendering the witness as an expert. The trial court initially overruled the objection. Later in the proceedings, Simon again interjected, claiming that the witness was testifying to her opinion and reasserted a

request to voir dire the witness as to her qualifications as an expert. The trial court revisited the issue after noting that the witness was clearly testifying to information "beyond the ken of the average juror." At Simon's request, the trial court allowed Simon to voir dire the witness as to her qualifications. The trial court found that the witness was qualified to testify as an expert in "digital forensics and this area of expertise."

Simon now claims on appeal that the witness did not need to qualify as an expert to testify during the trial and claims that the trial court's decision to qualify the witness as an expert was harmful. However, Simon's argument seems to misunderstand the trial court's ruling. The trial court qualified the witness as an expert in digital forensics, not as an expert in CellHawk. The witness did not need to qualify as an expert to operate CellHawk for the jury - a point that Simon concedes. However, the witness did need to qualify as an expert to testify about cellular networks and how they work. This testimony was relevant and helped the jury understand what the CDR and CSLI data captured by Simon's cellular service provider meant.

Simon urges us to find that the trial court erred in qualifying the witness as an expert. However, the entire exercise of qualifying the witness as an expert was

triggered by repeated objections from Simon. The State did not seek to tender the witness as an expert until Simon made a second objection concerning an inability to voir dire the witness as to her qualifications. Simon "cannot complain of a result he procured or aided in causing." *Pope v. State*, 266 Ga. App. 602, 603 (1) (597 SE2d 632) (2004); see also *WellStar Health System, Inc. v. Sutton*, 318 Ga. App. 802, 804 (1) (734 SE2d 764) (2012).

Following his voir dire of the witness, Simon objected to the witness being qualified as an expert because,

> she's never been certified [as an expert] before. She shows no degree. She shows some classes and training admittedly, unquestionably. But as to this specific area, I don't think she should be brought to the level of a doctoral or a CPA or a scientist or anyone of that nature. The area of software is quite complex, and I don't think there's been a sufficient background here to call her an expert.[4]

Georgia law does not require that a witness who is tendered as an expert have a particular educational degree. See *Gulley v. State*, 244 Ga. App. 629, 630 (1) (536

---

[4] At the time of this trial, the standard for expert testimony in criminal cases was found in OCGA § 24-7-707. The proper standard is now found in OCGA § 24-7-702. See Ga. L. 2022, p. 201, § 1 (amending OCGA § 24-7-702 to apply "in all proceedings" rather than only "in all civil proceedings" and repealing OCGA § 24-7-707).

SE2d 530) (2000) ("To qualify as an expert, generally all that is required is that a person be knowledgeable in a particular matter; h[er] special knowledge may be derived from experience as well as study, and formal education in the subject is not a requisite for expert status.") (citation omitted). What is required is that the witness, through her knowledge, skill, training, or education, is established to have knowledge that is beyond the ken of the average juror and which will assist trier of fact to understand the evidence or to determine a fact in issue. *Watson v. State*, 303 Ga. 758, 760-761 (2) (b) (814 SE2d 396) (2018) (a witness may be qualified to testify as an expert in a particular field if the witness demonstrates "special knowledge … derived from experience") (citation omitted). Whether the witness has or does not have a particular educational degree, has ever previously been qualified as an expert, or otherwise could have been more qualified goes to the weight the jury is to afford her testimony, not the admissibility of her testimony. *Mahogany v. State*, 366 Ga. App. 750, 754 (2) (a) (884 SE2d 141) (2023). Here, the trial court found that the witness had knowledge acquired through her training and experience to understand the technology surrounding how cell phones worked and how they interacted with cell towers. Given these determinations, the trial court found the witness' expertise

related to matters beyond the ken of the average juror. Appellate courts are mindful that trial courts have broad discretion to admit or exclude expert testimony. *Miller v. Golden Peanut Company, LLC*, 317 Ga. 22, 30 (2) (891 SE2d 776) (2023). The trial court did not abuse its discretion by authorizing the witness to be qualified as an expert in digital forensics.

However, it appears that Simon, both during the trial and in this appeal, has conflated the concept of the witness being qualified as an expert in digital forensics with her role in displaying the CellHawk maps during the trial. To be clear, the trial court did not find that the witness was qualified as an expert on CellHawk and the State never asked that the witness be so qualified. The witness was qualified as an expert in digital forensics and did provide limited testimony on that subject. No part of the trial court's ruling made any reference to her expertise, or lack thereof, concerning the manner in which CellHawk works. Simon's arguments on this point are without merit.

Secondarily, Simon argues that because there was no evidence admitted as to how CellHawk works and the accuracy of the program, that admission of the

testimony concerning CellHawk and the maps created by the program was improper because they constituted hearsay. This argument is also without merit.

> Hearsay is defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. [cit] Georgia's Evidence Code defines '[d]eclarant' as '*a person* who makes a statement." [cit] Finally, it defines 'statement' as '(1) [a]n oral or written assertion; or (2) [n]onverbal conduct of *a person, if it is intended by the person as an assertion.*' [cit] Accordingly, reports generated by a computer program are not considered hearsay as they are not the statements of a person." [cit]

*Bryan v. State*, ___ Ga. App. ___, 2024 WL 2842246 p. 6 of slip opinion (A24A0048 June 5, 2024) (emphasis in original). See *U.S. v. Lamons*, 532 F3d 1251, 1262-1263 (11th Cir 2008) (cell phone data generated by a machine does not qualify as hearsay - and does not pose Confrontation Clause concerns). This visual representation of data that was properly admitted in the form of a spreadsheet was not hearsay - there was no "statement" by a "person" within the task that CellHawk performed. Instead, the program merely plotted on a map the data contained within the independently admissible cellular service provider's spreadsheets that were properly admitted under

14

OCGA §§ 24-8-803 (6) and 24-9-902 (11). It was merely another way of presenting information that was admitted and properly before the jury. The trial court properly allowed the State to present the evidence to the jury through the use of CellHawk as a demonstrative aid and Simon's arguments on this point do not establish any error occurred during trial.

*Judgment affirmed. Dillard, P. J., and Brown, J., concur.*